B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Anglo Irish Bank Corporation Limited | DEFENDANTS<br>David K. Drumm |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Foley Hoag LLP<br>Seaport World Trade Center West<br>155 Seaport Boulevard, Boston, MA 02210<br>617-832-1000 | **ATTORNEYS** (If Known)<br>Stewart F. Grossman<br>Looney & Grossman LLP<br>101 Arch Street<br>Boston, MA 02110 |
| **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor     ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☒ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Exception to dischargeability of Debtor's indebtedness
to Plaintiff pursuant to 11 U.S.C. s. 523

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐1 62-Dischargeability - §523(a)(2), false pretenses, false representation,
   actual fraud
☒2 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
   **(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case -- 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
   if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>  David K. Drumm | BANKRUPTCY CASE NO.<br>  10-21198-FJB | |
| DISTRICT IN WHICH CASE IS PENDING<br>  Massachusetts | DIVISION OFFICE<br>  Eastern | NAME OF JUDGE<br>  Hon. Frank J. Bailey |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF<br>Anglo Irish Bank Corporation<br>Limited | DEFENDANT<br>David K. Drumm | ADVERSARY<br>PROCEEDING NO.<br>  New |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>  Massachusetts | DIVISION OFFICE<br>  Eastern | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>    August 31, 2011 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>   Kenneth S. Leonetti | |

## INSTRUCTIONS

   The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

   A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

   The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DAVID K. DRUMM, | ) | Chapter 7 |
| | ) | Case No. 10-21198-FJB |
| Debtor. | ) | |
| | ) | |
| | ) | |
| ANGLO IRISH BANK CORPORATION | ) | |
| LIMITED, | ) | |
| | ) | |
| Plaintiff. | ) | |
| v. | ) | Adv. Proceeding No. 11- |
| | ) | |
| DAVID K. DRUMM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY
## OF DEBT UNDER 11 U.S.C. § 523

Anglo Irish Bank Corporation Limited[1] ("Plaintiff" or "AIBC"), by and through

its undersigned counsel, files this Complaint to determine dischargeability of debt owed to AIBC

pursuant to section 523 of the Bankruptcy Code against David K. Drumm ("Defendant" or

"Drumm"), and respectfully represents as follows:

### NATURE OF THE CASE

1.      Defendant acted with fraudulent intent and purpose in committing

numerous frauds on AIBC during his tenure as AIBC's Group Chief Executive Officer ("CEO")

and executive director.  Among many acts of wrongdoing, Defendant deliberately concealed

---

[1] AIBC intends to change its name to Irish Bank Resolution Corporation Limited ("IBRC") in the near future.

information from non-executive board directors and fraudulently removed or caused to be altered

personal recourse loan provisions for several loans extended to himself, fellow executive

directors, and certain hand-picked high net worth customers (the "Maple 10 Investors").

Defendant's concealment and fraudulent acts were a desperate attempt to avoid serious financial

risk to himself, the other directors, and the favored investors arising from AIBC's sharply

declining share value at a time when the bank's very survival was rife with doubt.  These acts of

fraud perpetrated by Drumm breached his fiduciary duties to AIBC, causing AIBC, its

employees and shareholders, and, ultimately, Irish taxpayers millions of euros in losses, and

were substantial contributing factors to a loss of confidence in the bank and its nationalization in

January 2009.

      2.      Drumm's position that the non-recourse loans to AIBC's executive

directors, including himself, resulted from a mistake on his part and his purported failure to read

three-page loan facility letters is patently absurd and demonstrably false.  Within the span of just

a few short weeks in late September through mid-October 2008—a time when AIBC's share

price was plummeting, the Irish government had issued a blanket guarantee of Irish bank

liabilities, and the risk of AIBC's outright failure had become clearly apparent to Drumm—

      (a)      the 2007 directors' loans, which were full personal recourse facilities, were fraudulently documented as non-recourse approximately nine months after issuance, totalling €18,500,000 million in maximum amount, including Drumm's own loan of €7,650,000 million in maximum amount and approximately €8.6 million in total outstanding amount as of August 24, 2011, including accrued interest but excluding fees and costs;

      (b)      a loan to another executive director, William McAteer ("McAteer"), in the approximate maximum amount of €8.2 million, was made when it should have never been made, and was made on a non-recourse basis in a flagrant breach of Drumm's fiduciary duty; and

      (c)      facility letters altering recourse provisions were intentionally created with Drumm's participation and knowledge in order to obscure

2

and impair AIBC's right to recourse in a wrongful attempt to protect the Maple 10 Investors from an aggressive acquirer or a government receiver.

3.      In each case, Drumm controlled or directed the documentation and approval process for the loans, yet somehow claims in each instance—incredibly, especially in the case of his own loan—that he did not bother to read the facility letters and therefore did not recall the fraudulent non-recourse term.  Drumm signed the Borrower's Acceptance for his own €7.65 million loan—the single largest borrowing in his life—attesting to having read the loan and agreeing to its terms, but insists that his attestation was a lie.  He also claims to have never read the facility letters that he signed on behalf of AIBC for three other executive directors.  These facility letters also included the fraudulent non-recourse provision that Drumm professes not to have known about.  The idea that Drumm—a sophisticated and experienced lender and Chartered Accountant, and the CEO of the very bank making his loan pursuant to a facility letter that he attested to having read and understood—had, in fact, never read or had no idea of the fraudulent documentation, is absurd.  Coincidence, mistake, inadvertence or negligence cannot explain the remarkable timing and consistent response of Drumm to the liquidity crisis and AIBC's declining share price:  to remove or alter the personal recourse term for each and every loan owed by himself, other executive directors of AIBC, and the Maple 10 Investors, an act contrary to all manner of appropriate and honest behavior.

4.      Concealment and non-disclosure also marked the fraudulent transactions under Drumm's purview, causing enormous damage to AIBC and contributing to the bank's demise once these deceptive dealings were finally uncovered.  Despite his knowledge of AIBC's then Chairman Sean FitzPatrick's ("FitzPatrick") loan warehousing transactions with Irish Nationwide Building Society ("INBS")—transactions designed to wrongfully conceal the enormous extent of FitzPatrick's personal loans from AIBC—not once during his tenure as CEO

3

did Drumm ever disclose the warehousing transactions to AIBC's non-executive board members, as he was duty bound to do.

5.      As a Chartered Accountant, Drumm unmistakably must have known the harm that would result upon the eventual disclosure of FitzPatrick's loan warehousing, including a greatly diminished standing of the bank and the resignation of its Chairman on December 18, 2008.  Drumm's own resignation followed the next day, December 19.  Both resignations resulted from disclosure of the loan warehousing transactions.  From 2005 to 2008, due to Drumm's failure to disclose and properly deal with the warehousing practice, FitzPatrick's debt skyrocketed, resulting in approximately €98 million in new loans that would never have been made if Drumm had fulfilled his fiduciary duties and disclosed the loan warehousing when he found out about such practices in 2005.  Similarly, Drumm concealed from AIBC's non-executive board members the altered recourse facility letters to the Maple 10 Investors and the fraudulently documented non-recourse directors' loans, executed through clever and corrupt schemes to obscure loan approvals and control documentation, and at all times disguising or covering up the intentionally and fraudulently alteration of each loan from recourse to non-recourse or to uncertain recourse.  When confronted with this massive pattern of wrongdoing with respect to his, McAteer's, FitzPatrick's, the other directors', and the Maple 10 Investors' loans—Drumm lied in this proceeding, under oath, again and again denying any involvement and knowledge that he clearly and demonstrably had at all relevant times.

6.      As AIBC's CEO, Drumm was a central player in the funding crisis brought about by the credit crunch commencing in 2007.  He was intimately aware of AIBC's difficult funding position when the full recourse directors' loans were made in November of 2007, and understood the very significant risk he and the other executive directors were taking in

4

agreeing to the directors' loans at that time.  Accordingly, Drumm resented taking his full

recourse loan and always intended that the full recourse directors' loans, including his own,

would be documented as non-recourse if he and the other directors became exposed to personal

losses resulting from the future deterioration of AIBC's share price, which was the sole collateral

for the loans.  Knowing that AIBC's practice was to lend to directors on a full recourse basis,

Drumm carried out his plans by manipulating his position as CEO to control and delay

documenting the full recourse directors' loans—for some <u>nine months after</u> the loans were

made—until he could see how AIBC's stock had actually performed.  This deceptive practice

gave Drumm the ability to document the directors' loans as non-recourse, if necessary, to protect

himself, and the other executive directors, from the enormous liabilities attendant to a full

recourse loan in the face of AIBC's still rapidly deteriorating share price.  When the situation

significantly worsened for AIBC—presenting the prospect of a total loss on AIBC's shares—

Drumm acted knowingly and intentionally to interfere with AIBC's right to enforce the loans on

a full personal recourse basis by fraudulently documenting the loans as non-recourse.

       7.      For good measure, in the event his non-recourse scheme failed, Drumm

transferred significant amounts of cash from his AIBC account to accounts held jointly with his

wife, or exclusively in his wife's name.  Drumm's fraudulent transfers to his wife reached a fever

pitch when AIBC's fate—and his demise as CEO—became exceedingly obvious, and continued

thereafter, with transfers occurring within two years of the Petition Date (as defined below)

totalling approximately $1 million.  Drumm intentionally failed to disclose these fraudulent

transfers in his October 29, 2010 schedules and statement of financial affairs filed in this

proceeding and sworn by Drumm to be truthful and accurate.  Drumm only belatedly amended

his schedules and statement of financial affairs on May 17, 2011 after AIBC's counsel and the

Trustee had exposed the fraudulent transfers during Drumm's examination at the Section 341 Creditors' Meeting held on April 1, 2011.

8.      In addition, within one year of the Petition Date, Drumm deliberately concealed from AIBC the purchase of, and his interest in the home equity of, the family's primary residence at 73 Old Colony Rd., Wellesley, Massachusetts 02481, which was purchased using a nominee trust arrangement.  Drumm also used the purchase of the Wellesley family home to shelter substantial fraudulent transfers to his wife when he executed a contemporaneous separate property agreement with his wife in which he transferred and disclaimed any interest in the home equity.  Drumm insists that his beneficial interest in the Wellesley property has no value, although the vast majority of the funds used to purchase the residence originated from his earnings.

9.      Tellingly, as set forth in AIBC's contemporaneously filed complaint for denial of discharge pursuant to section 727 of the Bankruptcy Code, throughout his Chapter 7 case, Drumm has testified falsely and engaged in a pattern of conduct to conceal from and defraud AIBC, Kathleen P. Dwyer, the duly appointed Chapter 7 Trustee (the "Trustee"), and other parties in interest.  Despite the generous time granted by the Trustee to make a full and complete disclosure, Drumm remains uncooperative and far short of candid in disclosing the actual value of certain of his assets, and continues to assert a purported undocumented unsecured loan claim on behalf of his wife for approximately $200,000, which is no loan at all, but represents funds used by the household that primarily originated with Drumm's earnings and other property interests.  Drumm has chosen to play fast and loose with his statutorily required disclosures and open dealings with his creditors, with his acts of concealment and fraud on his creditors extending now almost a year into his Chapter 7 case.

10.     Drumm's well-established pattern of concealment, deception, manipulation, falsehood, and intentionally fraudulent behavior—both during his tenure as AIBC's CEO and his Chapter 7 case—contravene the intent and spirit of bankruptcy to provide fresh start relief to the "honest, but unfortunate debtor" and fully merits an exception from discharge as to AIBC's debts.  By committing intentionally fraudulent and egregious acts and omissions to defraud, mislead, or induce AIBC to extend or to alter the terms of prior extensions of credit to himself, FitzPatrick, the other directors, and the Maple 10 Investors—during a time when Drumm owed fiduciary duties to AIBC—this case falls squarely within the provisions of section 523 of the Bankruptcy Code and the facts fully support an exception from discharge of Drumm's debts to AIBC.

## PARTIES

11.     Plaintiff AIBC is an Irish financial institution and maintains its registered office and headquarters at Stephen Court, 18/21 St. Stephen's Green, Dublin 2, Ireland.

12.     Defendant David K. Drumm is an individual who resides at 73 Old Colony Rd., Wellesley, Massachusetts 02481.

## JURISDICTION AND VENUE

13.     Drumm filed a petition for Chapter 7 relief on October 14, 2010 (the "Petition Date").

14.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

15.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) arising under section 523 of the Bankruptcy Code and Rule 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

7

## STATEMENT OF FACTS

**(Facts Underlying Nondischargeability of Debt under 11 U.S.C. § 523)**

**I.      Defendant's Background**

16.      Drumm became a Chartered Accountant in Ireland in 1988 after completing his training and taking the relevant exams.

17.      Drumm joined AIBC in May 1993, and was employed by AIBC through January 2009, having held various positions until he was both appointed CEO designate and joined the board of directors as an executive director on or about September 22, 2004, positions he obtained with the support of AIBC's then CEO FitzPatrick.

18.      Drumm assumed the position of Group CEO in January 2005.  FitzPatrick took the position of non-executive Chairman upon Drumm's ascendance to the CEO position, and remained a director of the bank.

19.      Prior to his appointment as CEO, Drumm held several senior positions in AIBC's lending operations, and established its US operations in Boston in the late 1990s.  He returned to Ireland in 2003 in the role of Divisional Director and Head of Banking.

20.      By 2003, Drumm was a sophisticated and experienced lender with many years of direct lending experience and managerial oversight of the lending business.

21.      At the time of his appointment as CEO designate, AIBC was Ireland's third largest bank with €34.3 billion in assets and over €500 million in profit as of fiscal year 2004.

22.      In September 2008, after more than a year of struggling with the financial crisis and attendant liquidity problems, the Irish government issued a blanket guarantee to support Irish banks, including AIBC, on the eve of AIBC's fiscal year end.

23.     On the day Drumm resigned on December 19, 2008, amidst scandal and the forced resignation of AIBC's Chairman FitzPatrick, AIBC's shares closed at €0.274.  Even with the Irish government's guarantee, the viability of the bank was in serious doubt.

24.     AIBC was nationalized by the Irish government on January 21, 2009 pursuant to the Anglo Irish Bank Corporation Act, 2009, which provided that all shares in the bank were vested in the Minister for Finance, and the bank was re-registered as a private limited company.

25.     Drumm fled Ireland in June 2009, following the transfer to his wife of his 50% interest in their home in Ireland, and in the face of likely litigation over his debt to AIBC and investigations related to his wrongful conduct at AIBC.  He moved to the United States on an E-2 Treaty Investor Visa, the groundwork for which he initiated in early 2008, shortly after he took the undocumented, multi-million euro recourse share loan from AIBC in late 2007.

26.     Various investigations in Ireland into the affairs of AIBC while Drumm was CEO are ongoing and are being conducted by the Director of Corporate Enforcement, the Garda Bureau of Fraud Investigation and the Central Bank of Ireland, among others.

27.     Drumm is also the subject of an investigation by Ireland's Chartered Accountants Regulatory Board ("CARB"), for which CARB's special investigator has already certified prima facie cases against Drumm in respect of the following acts of wrongdoing:

> (a)     his role in relation to the temporary transfers of loans of Sean FitzPatrick and their non-disclosure in the financial statements of Anglo Irish Bank;
>
> (b)     his role in relation to the amendment of the terms of the loans made to ten customers [the Maple 10 Investors] of Anglo Irish Bank Corporation Limited for the purchase of shares in Anglo Irish Bank;
>
> (c)     his role in relation to certain loans made to four key management personnel [himself, Pat Whelan ("Whelan"), Declan Quilligan ("Quilligan"), and Tony Campbell ("Campbell")]; and

(d)    his role in relation to a non-recourse loan made to William McAteer in 2008 so that McAteer could pay off another loan to the Bank of Ireland.

28.    An investigation by the Central Bank of Ireland and public disciplinary hearings in the context of formal complaints forwarded to the CARB disciplinary committee against Drumm, FitzPatrick, and others, have been postponed following a request from the Director of Public Prosecutions in consideration of pending criminal investigations in Ireland.

29.    Between 2004 and 2009, Drumm received substantial compensation of approximately €13 million ($18 million)[2] through his employment by AIBC.

## II.    FitzPatrick Loan Warehousing Scheme

30.    During Drumm's tenure as CEO, AIBC's former Chairman FitzPatrick engaged in loan warehousing transactions with INBS to refinance his loans from AIBC for short time periods straddling AIBC's fiscal year end of September 30 in 2005, 2006, and 2007.

31.    The loan warehousing transactions entailed a loan from INBS to pay down the AIBC loan facilities just before AIBC's fiscal year end, leaving the AIBC facilities as undrawn credit facilities at year end, and then redrawing the AIBC facilities to pay off the INBS loans within a short time after AIBC's fiscal year end. The security for the AIBC loan facilities was temporarily transferred to INBS during the term of the warehousing transaction, despite the undrawn committed facilities remaining on AIBC's books.

32.    The primary purpose of the loan warehousing transactions was to conceal the extent of FitzPatrick's borrowings with AIBC, which were large in 2005 and which became massive in the years after Drumm became aware of the loan warehousing in 2005.

---

[2]  The Euro-US Dollar equivalent foreign exchange rate used herein for convenience is €1 per $1.4089, the exchange rate as of 4:00 p.m. Irish time on the Petition Date.

33.     Drumm knew about the ever-escalating loan warehousing transactions starting in 2005 and continuing throughout his tenure as AIBC's CEO, but he never disclosed the practice to the board of directors or took any action to stop or curtail the Chairman's loan manipulation, although he concedes that it was inappropriate for FitzPatrick to remain as Chairman in light of these practices.

34.     Drumm knew the importance of transparency in financial disclosures and in ensuring the good standing of and confidence in the bank, and that the non-disclosure of loan warehousing transactions intended to conceal the scope and size of FitzPatrick's indebtedness to AIBC was inappropriate and unacceptable.

35.     Drumm was also aware of AIBC's code of conduct that required its officers, including Drumm, to operate the business with the highest business ethical standards so that the integrity and honesty of its officers were not in question.

36.     As CEO and executive director, Drumm had a duty to disclose the loan warehousing transactions.

37.     Drumm had full knowledge of the reporting requirements as a Chartered Accountant in Ireland and was responsible to oversee the accurate reporting of AIBC's financial condition.

38.     Drumm's complicity in the loan warehousing scheme made possible a dramatic increase in the personal borrowings of FitzPatrick and related parties from AIBC from approximately €22 million as of December 2004 to a staggering €120 million in maximum amount and approximately €103 million in outstanding amount as of November 2007, settling on an outstanding balance of approximately €86 million as of February 2009.

11

39.     In 2005, FitzPatrick renewed various facilities with AIBC, and warehoused with INBS loans in the amount of €11,089,243 and $19,525,289, a substantial portion of his total loans outstanding with AIBC of approximately €46 million as of September 30, 2005.

40.     Without intervention or disclosure, and with Drumm's knowledge, just prior to the fiscal year end of September 30, 2006, FitzPatrick refinanced his AIBC loans with INBS in the amount of €26,832,283 and $26,861,753, resulting in a much lower figure for aggregate directors' loans in AIBC's 2006 annual report of €25 million.

41.     In 2007, FitzPatrick dramatically increased his borrowings and refinanced his AIBC loans with INBS in the amount of GBP 14,322,401, €61,739,913 and $56,086,979.

42.     Drumm knew the extent of FitzPatrick's borrowings in 2007.  On May 30, 2007, Drumm approved a credit committee application for new loans to FitzPatrick, at which time FitzPatrick's borrowings were €67.539 million with a credit limit of €75 million, which was increased with Drumm's approval to €88.5 million.  On the very same day, Drumm also approved a credit limit of €11.5 million for one of FitzPatrick's children and approved the renewal of a joint facility held by FitzPatrick and Lar Bradshaw, a non-executive director, in the amount of €30 million.

43.     In November 2007, just two months after AIBC's fiscal year end, Drumm approved yet another credit committee application for FitzPatrick, this time approving a new credit limit of €120 million.  The credit committee application signed by Drumm indicated that FitzPatrick's borrowings had reached the staggering level of €103.136 million.

44.     In December 2007, FitzPatrick's loan balance reached over €120 million, a level that vastly exceeded the borrowings of all directors at other Irish banks.

12

45.     As a direct result of Drumm's concealment and failure to act to end the
annual warehousing practice, Drumm authorized or permitted AIBC to extend approximately
€98 million in new loans to FitzPatrick from 2005 to 2008 that would not have been made if, in
2005, Drumm had disclosed the loan warehousing transactions and taken appropriate steps to
stop the practice such as requesting FitzPatrick's resignation.

46.     Drumm's failure in 2005, 2006, and 2007 to disclose the full extent of
FitzPatrick's loans constituted serious misconduct.

47.     FitzPatrick's much belated disclosure of the loan warehousing transactions
to the board of directors in December 2008 caused FitzPatrick's immediate resignation from
AIBC on December 18, 2008.  Needless to say, his resignation would have occurred years earlier
if Drumm had advised the board of FitzPatrick's warehousing when Drumm first learned about
such practice in 2005.  Drumm has testified that the board should have asked FitzPatrick to
resign as soon as the board had been made aware of his warehousing of loans, whenever that
occurred.  Had Drumm fulfilled his duties and had an earlier resignation of FitzPatrick occurred,
no additional loans would have been made by AIBC to FitzPatrick after 2005.

48.     In response to FitzPatrick's disclosure, Drumm resigned from AIBC the
following day on December 19, 2008, an action which he deemed an appropriate response to the
loan warehousing scandal.

49.     The disclosure of the loan warehousing transactions greatly diminished the
standing of AIBC and resulted in the widespread loss of confidence in the bank, causing a 49%
decline in the share value from 39 cents on December 17, 2008 to 20 cents on December 30,
2008, and contributing to AIBC's nationalization a month later in January 2009.

50.     When the Irish government announced the nationalization of AIBC, it blamed the "unacceptable practices" of its management, including the loan warehousing scheme, that "caused serious reputational damage to the bank" in addition to the bank's weak funding position, for the public takeover of the bank.

## III.     Directors' Loans

51.     At the end of 2007, the credit crunch had started, causing a number of banks, including AIBC, to experience difficulty and negative news coverage, with increasing pressure on the bank's funding and share price.  Under such market pressure, AIBC's share price became volatile and declined from approximately €16 in May 2007 to a fluctuating price level in the range of €9 to €11 in late 2007.  In response, AIBC's then Chairman FitzPatrick believed that executive directors should demonstrate confidence in the bank by exercising share options, and that non-executive directors should purchase additional shares in the bank, in each case funded by full recourse share loan facilities granted by the bank.  Obviously, it was understood that such loan facilities, while collateralized by the AIBC shares purchased with the loans, would be fully recourse to the individuals' personal assets.  Otherwise, the "show" of purported confidence in AIBC would have been meaningless.

52.     On or about November 28, 2007, four senior executives and executive directors, including Drumm, in an apparent show of support for the bank, exercised their in-the-money stock options at a strike price that represented a discount to the then current stock price of approximately €11, and each of them were issued share certificates for the stock purchased by the options, using share loans issued by AIBC as described below:

> (a)     Drumm, AIBC's CEO and an executive director on the board of directors, exercised options to purchase 500,000 shares of AIBC stock at the discounted strike price of €7.965 per share through a recourse share loan totalling €4,396,600, comprised of €3,982,500 to fund the share

purchase and €414,100 to cover the tax liability caused by the exercise of
in-the-money options;

(b)     Quilligan, chief executive of operations in the United Kingdom
(UK) and an executive director on the board of directors, exercised options
to purchase 100,000 shares of AIBC at €4.675 per share and 200,000
shares at €7.965 per share for an aggregate recourse share loan amount of
€2,689,975, comprised of €2,060,500 to fund the share purchase and
€629,475 to cover the tax liability;

(c)     Whelan, managing director for Ireland and an executive director on
the board of directors, exercised options to purchase 100,000 shares at
€7.965 per share, resulting in an aggregate recourse share loan amount of
€881,550, comprised of €796,500 to fund the share purchase and €85,050
to cover the tax liability;

(d)     Campbell, a senior executive heading operations in the United
States and an executive director (non-board position), exercised options to
purchase 200,000 shares at €7.965 per share through a recourse share loan
totalling €1,645,338, comprised of €1,593,000 to fund the share purchase
and €52,338 to cover the tax liability.

53.     Each of the above-listed full personal recourse share loans was funded

without prior or contemporaneous credit committee approval or loan documentation setting forth

the terms of the loans at the time of the share purchases in late 2007 and/or loan draw downs on

or about January 30, 2008.  Indeed, Drumm prevented the share loans from being documented at

or near the time they were made by instructing AIBC employees that he wanted to "regularise"

the documentation of all pre-existing and newly extended directors' loans, all of which were

extended by AIBC on a full recourse basis.

54.     What no one understood at the time is that Drumm intended to prevent any

documentation of the loans so he could wait and see how AIBC's stock performed.  If, as proved

to be the case, AIBC's stock price further deteriorated, Drumm hatched a plan to mis-document

the new full recourse directors' loans as non-recourse—and to also document or re-document all

pre-existing full recourse directors' loans as non-recourse—so that he and the other directors

would not sustain personal losses.

15

55.     By late 2007, as a result of AIBC's practice of awarding stock options to encourage stock ownership in the bank, a material portion of each executive director's prior indebtedness and/or personal wealth was already tied to AIBC's stock performance, and by agreeing to the full personal recourse share loans, the executive directors became even more vulnerable to large drops in AIBC's stock price, but only if the loans were in fact fully recourse to their personal assets.

56.     For example, prior to his November 2007 share loan, in May 2007, Drumm took a full recourse share loan of €1,852,580 to purchase 200,000 AIBC shares at an option exercise price of €4.27 per share, inclusive of tax liability, in addition to a prior full recourse share loan in 2005 of approximately €1.2 million to purchase 50,000 AIBC shares and to fulfill tax liabilities on the share purchases.  These prior share loans had been full recourse when they were made, but were wrongfully documented as non-recourse loans by Drumm when he later "regularised" all outstanding directors' loans as non-recourse loans.

57.     As CEO and an experienced lender with AIBC, Drumm knew that, according to AIBC's usual lending practices, the share loans were necessarily full personal recourse, and would likely involve a security cover provision, among other protections for the bank, including a maximum loan to value ("LTV") ratio of 75% as generally used for share loans, in addition to holding the shares as collateral.

58.     Drumm also knew that the 2007 share loan was a very significant risk for him to take, especially in view of the market conditions and risk to the bank at the time.

59.     For Drumm, the share loan represented the single largest borrowing ever undertaken by him, vastly exceeding any of his prior borrowings from AIBC or anyone.

60.     Accordingly, a full recourse share loan facility of this magnitude exposed Drumm to the possibility of a devastating loss if AIBC's shares lost significant value.

61.     Drumm was keenly aware of the significant personal financial risks presented by his fully recourse 2007 share loan, as well as his pre-existing loans, and therefore always intended to preserve an option to falsely document his share loans on a non-recourse basis if AIBC's stock price significantly deteriorated.

62.     Thus, when he agreed to his fully recourse 2007 share loan, Drumm misrepresented the terms under which he would take his share loan, and the terms extended to the other executive directors, to deceive the bank and to conceal the optional non-recourse nature of each of the directors' loans, including his own, from AIBC's non-executive directors. Drumm's actions to misrepresent the terms of the directors' loans violated AIBC's lending standards and customary banking practices.

63.     Fearing substantial losses, in order to effectuate the non-recourse loan term in contravention of AIBC's lending practices and industry norms, Drumm took control of the loan documentation process, reserving for himself the option of waiting to document the directors' loans until he could determine AIBC's ultimate performance and actual share price in the industry downturn.  Drumm then positioned himself to implement the non-recourse provision in the event of a decline in AIBC's share price.

64.     In late 2007, Drumm knew that a future decline in AIBC's share price was a real possibility given extreme market pressures on the bank and the financial sector as a whole. Drumm acted in complete disregard for and in conflict with the best interests of the bank and the bank's lending standards and practices when he perpetrated his scheme to control documentation

17

until performance of AIBC's shares could be known.  Drumm's scheme was solely intended to personally benefit Drumm and his fellow directors.

65.     Now in control of the documentation process, on or about December 2007, Drumm went through the motions of initiating a plan to "regularise" or "tidy up" all of the directors' loans, by overseeing the preparation of loan term sheets for each of the directors' loans, encompassing all of the directors' prior and new loans, including his own.  Drumm, however, ensured that no documentation was actually finalized until AIBC's share performance was known in order to preserve the option of ultimately documenting (or rather, mis-documenting) the directors' loans as non-recourse.

66.     Throughout Drumm's charade to "regularise" the directors' loans, Drumm was the only person directly managing and controlling the loan documentation process for all the directors' loans.  Drumm had delegated the documentation task to an AIBC employee, who worked under his direction and deferred to Drumm as CEO.  Ensuring tight control over the documentation process was essential to Drumm's plan to slip in a non-recourse term if and when needed.  Drumm instructed the employee to prepare the term sheets for the "tidied up" directors' loans, expressly providing that the purpose of the new facilities was to "regularise" all existing loans.  Drumm reviewed these term sheets and approved of the multiple loan consolidation of the directors' prior and new loans.  However, Drumm then proceeded to ignore the employee for many months, refusing to finalize any of the directors' loans until he knew whether his share purchases would profit or ruin him.

67.     From February 2008 through June 2008, in order to stall the documentation process and avoid finalizing the documentation for the directors' loans while market pressures continued to mount and AIBC's stock price followed a downward trend,

Drumm repeatedly evaded requests to complete the loan documentation, variously instructing the AIBC employee reporting to him to put "on ice" or "park" the documentation process.

68.     By controlling the documentation process, Drumm deliberately delayed the creation and execution of the loan facility letters until the value of the AIBC share collateral (and thus the directors' potential personal losses) could be ascertained.

69.     On or shortly before September 22, 2008, many months after the AIBC employee had created loan documentation reflecting that the directors' loans were recourse to the personal assets of the directors, the AIBC employee received on his desk an unaddressed envelope containing a handwritten mark-up of a standard facility letter providing that the directors' loans were to be documented as non-recourse.

70.     The timing was not coincidental as the financial crisis had significantly worsened in September 2008 with the bankruptcy of Lehman Brothers and the purchase of Merrill Lynch by Bank of America, among other market events that month, dramatically limiting AIBC's access to funding and leading Drumm to appeal to the Irish regulators to issue a statement reassuring the markets that no Irish regulated financial institution would be allowed to fail.

71.     When the loan documentation was finally produced on or about September 22, 2008, each of the facility letters for the directors' loans included at the end of the security provision appearing on the first page of the two and a half page facility letter the following term: "The facility is a non-recourse facility limited to the shareholdings held in Anglo Irish Bank and held as security."

72.     Under extreme market pressure, AIBC's share price was then trading at less than €5, and the share loans were underwater. If the directors' loans had not been

documented as non-recourse loans at that time, Drumm knew to a certainty that he would lose millions of euros of personal assets, if not his entire net worth, and that the other directors would also experience severe losses.

73.    By ultimately recharacterizing the outstanding full recourse directors' loans as non-recourse loans, Drumm attempted to eliminate the substantial personal liabilities to AIBC owed by himself and by the other executive directors on account of the share loans.

74.    Drumm falsely testified that the non-recourse language was the result of a mistake and that he was not aware of how the language had been inserted into each and every one of the facility letters, and falsely denied that he was involved in the preparation of the loan documentation.

75.    Although Drumm never resolved the "regularisation" process with the AIBC employee started nine months earlier, he nonetheless proceeded without reservation to just sign the Borrower's Acceptance for the non-recourse facility letter documenting his own substantial loan in the maximum amount of €7,650,000.

76.    By signing the Borrower's Acceptance for the non-recourse facility letter, Drumm attested to reading the facility letter and confirming that he fully understood the terms of the agreement.

77.    Drumm falsely testified that he never read his own facility letter.

78.    Drumm falsely testified that he did not think about the terms of his own facility letter and was unaware of the terms of his loan when he signed his facility letter.

79.    Drumm falsely testified that he could not recall how the loan documents, including his own, appeared in his office for signature, or the identity of the senior person who presented the facility letters to him.

80.     Drumm signed the non-recourse facility letters on behalf of AIBC as its CEO and as an "A" signatory under its credit policy for Quilligan, Whelan, and Campbell, intentionally removing personal recourse for the 2007 and pre-existing directors' loans.

81.     Drumm misused his position of trust as CEO to control the approval process and signing of the facility letters.  Drumm limited the signatories to himself and an associate director of Human Resources, who had been used as a formality and not as a control signatory, except for Drumm's own loan.  Drumm's facility letter was signed by Whelan, whose facility letter and related credit committee approval were signed by Drumm, and by the Human Resources employee.

82.     Drumm falsely testified that he never read a word of the facility letters he signed on behalf of the bank for the other executive directors.

83.     Drumm falsely testified that he was unaware of the terms of the facility letters for the other executive directors.

84.     Drumm falsely testified that he did not review the maximum amounts of each of the executive directors' loans in the non-recourse facility letters, including his own, and was therefore unaware of the multiple loan consolidation accomplished by the letters or of the insertion of the non-recourse language.

85.     The credit committee applications signed by Drumm did not indicate that the loans were non-recourse.

86.     Although Drumm acknowledged that the facility letters were executed many months after he and the other executive directors had been granted AIBC shares upon exercise of their share options, and after they had already received the draw downs to pay for the

shares and tax liabilities, Drumm falsely testified that he did not remember executing the facility

letters in September 2008.

87.    AIBC's share price closed at €4.760 on September 22, 2008, a price level

substantially lower than the €11.500 price used in the credit committee applications to paper

approval of the directors' loans, and signed by the directors, including Drumm.  At a price of

€4.760, the value of the AIBC share collateral was insufficient to cover the directors' loans.

88.    As a signatory to the credit committee approvals for the other executive

directors, Drumm falsely testified that he was not involved in the credit committee approvals and

the timing thereof.

89.    On or about September 22, 2008, Drumm and AIBC's then Chairman

sought a possible merger and other options to address AIBC's funding and strategic options.

90.    Drumm was also in regular contact with the Irish Financial Regulator

concerning AIBC's funding crisis in advance of its fiscal year end on September 30, 2008.

91.    Drumm falsely testified that he had no idea why September 22, 2008 was

the day the non-recourse facility letters were finally signed.

92.    Despite ensuring that his full personal recourse directors' loan was

documented as non-recourse, Drumm was still concerned about the risks entailed by his loan and

started to transfer substantial amounts of money from his AIBC bank account to his wife,

beginning with a €150,000 transfer to her bank account on or about September 24, 2008.

93.    When the non-recourse facility letters were drawn to the attention of

AIBC's new chairman in early January 2009, Drumm misrepresented to AIBC that the non-

recourse language had been the result of a mistake or a clerical error, and stated that he had

always intended the loans to have been made on a full recourse basis.  Through his

misrepresentation, Drumm intended to induce AIBC to extend and renew his loan by another year and to forebear from exercising its demand rights on the matured loan.  Drumm also created this fabrication to potentially escape criminal liability for his prior fraud.

94.     In justifiable and reasonable reliance on Drumm's false representations that the non-recourse provision had been the result of a mistake, AIBC agreed to renew the directors' loans for another year through replacement facility letters dated January 7, 2009 that corrected the non-recourse issue.

95.     Despite maintaining that his loan was always full recourse and that the non-recourse facility letter was a non-issue, Drumm did not immediately sign the new 2009 facility letter presented to him on or about January 7, 2009 to correct the non-recourse language. In fact, Drumm was very reluctant to execute the 2009 facility letter.

96.     Drumm did not immediately correct his so-called "mistake" in signing various loan documents on behalf of the bank committing it to undercollateralized non-recourse share loans to the executive directors.  Drumm instead used the leverage he had created by the non-recourse facility letter dated January 10, 2008 to try to negotiate a better deal for himself, including a long-term repayment plan and limited recourse, although his loan had already matured on December 31, 2008 and was due and payable.

IV.     **The McAteer Loan**

97.     Within a week of executing the non-recourse facility letters for the directors' loans, on or about September 29, 2008, Drumm ensured that yet another executive director, McAteer, AIBC's then Finance Director, would be granted a non-recourse loan, just like the other directors (the "McAteer Loan").

23

98.     McAteer had a pre-existing share loan with Bank of Ireland which he had used to fund the purchase of 3.3 million AIBC shares in an approximate maximum amount of €8.2 million.

99.     On information and belief, due to the drop in AIBC's share price, on or about September 29, 2008, the Bank of Ireland loan had tripped a "trigger" covenant, at which point the LTV ratio reached a floor and gave Bank of Ireland a right to sell the AIBC shares and/or request additional security for the loan.

100.    McAteer told Drumm that Bank of Ireland intended to sell the AIBC shares it held as collateral for the loan.

101.    If Bank of Ireland had sold the McAteer shares in AIBC, as it was expected to do, the loan would have been satisfied and McAteer would not have faced personal liability on the Bank of Ireland loan.

102.    It was agreed by Drumm and McAteer, with Drumm purportedly acting on behalf of AIBC, that AIBC would refinance the Bank of Ireland loan in order to keep Bank of Ireland from selling McAteer's AIBC shares.

103.    Knowing that he would be free and clear of the Bank of Ireland loan obligation if the shares had been sold, McAteer requested that the loan be made on a non-recourse basis and only agreed to take a loan from AIBC on non-recourse terms.

104.    Even on a fully recourse basis, McAteer's request was highly unusual. The McAteer Loan was not a share loan in the ordinary course used to purchase AIBC shares, but was made to refinance McAteer's existing loan with another banking institution that was collateralized by AIBC shares already owned by the executive director.

24

105.    On or about September 29, 2008, during a quick meeting, Drumm agreed to refinance the Bank of Ireland loan and approved the McAteer Loan for whatever amount was required to take out Bank of Ireland.

106.    Drumm falsely testified that the terms of the loan, including the non-recourse provision, were not discussed when he decided to approve the McAteer Loan.

107.    When he approved the non-recourse McAteer Loan and instigated the transaction, Drumm conducted little or no due diligence of the Bank of Ireland loan and acted without due care, instructing AIBC's lending personnel to just do the loan and to document the loan the same as the other directors' loans, which Drumm well knew had been executed just one week prior as non-recourse facilities.

108.    The facility letter for the McAteer Loan was documented using the same facility letter template as that used to document the other directors' loans, during a time when AIBC's share price was highly volatile and plummeting.

109.    The McAteer Loan facility letter did not include any LTV ratio triggers like the Bank of Ireland loan or any security cover provision to enable AIBC to request additional security.  With Drumm's approval, the loan was made on non-recourse terms.

110.    On September 29, 2008, AIBC extended to McAteer a loan facility of €8,910,000, including an interest roll-up facility of €660,000, and McAteer drew down €8,246,307 to satisfy his obligation to Bank of Ireland.

111.    At the time the McAteer Loan was made, the loan was inadequately collateralized by the 3.3 million shares.  AIBC's closing share price of €2.300 on September 29, 2008 represented a 37% loss in the value of the collateral relative to the €3.650 share price used

for credit committee approval and a 46% loss relative to AIBC's opening share price of €4.276 on September 29, 2008.

112.    On information and belief, the documentation for the McAteer Loan, including the facility letter and credit committee approval, were completed on or about September 30, 2008, and backdated to September 29, 2008.

113.    Drumm's approval of the McAteer Loan, even if had been on a fully recourse basis, constituted highly unusual, reckless, and imprudent lending, especially in light of AIBC's liquidity crisis, which made funding for new loans scarce and difficult to obtain in the markets.

114.    On a non-recourse basis, the McAteer Loan clearly was made adversely to the interests of AIBC.  The non-recourse McAteer Loan was made on preferential terms that would not have been available to a person unrelated to AIBC on an arm's-length basis under similar circumstances, and was not made in the ordinary course of business on normal commercial terms.

115.    Contrary to Drumm's assertion that the McAteer Loan had to be made, the McAteer Loan should never have been approved by Drumm, and as a result of his approval and instruction to do the loan, made by AIBC.  And certainly the McAteer loan should never have been approved by Drumm on non-recourse terms.

116.    Although not a single instance of a non-recourse directors' loan occurred prior to 2008, during a time of an aggressively declining share price and the future of AIBC in doubt, Drumm approved, caused or permitted AIBC to document five executive director loans, as purportedly non-recourse, including his own loan, in an aggregate maximum amount of approximately €27 million in 2008, each undercollateralized by AIBC's shares.  None of these

loans would have been made by AIBC on a non-recourse basis.  The non-recourse language inserted into these loans violated AIBC's credit policies and practices, intentionally impaired AIBC's position for the personal financial benefit of Drumm and the other directors, and was only possible because Drumm had abused his role as CEO and reserved for himself at the outset the ability to document the loans as non-recourse.

117.    In January 2009, following an internal review of directors' loans, AIBC's new chairman became aware of the non-recourse McAteer Loan, and, as was done with the other directors' loans, McAteer was asked to agree to a new facility letter renewing the McAteer Loan on recourse terms.

118.    Although McAteer initially argued that his loan was non-recourse, on or about February 19, 2009, he agreed to a recourse facility letter.

## V.    Maple 10 Investor Modified Facility Letters

119.    In or around July 2008, Drumm instigated a private placement of approximately 102 million shares of AIBC common stock or approximately 9.4% of the total outstanding amount of AIBC common shares with ten hand-picked, high net worth customers, as previously defined, the Maple 10 Investors.

120.    The private placement was intended by Drumm to reduce a large exposure to AIBC's shares incurred by Sean Quinn and related parties through "contract for difference" derivatives that provided exposure to AIBC's share price.

121.    The private placement was devised by Drumm after other alternatives to place the shares with institutional investors had failed.

122.    Drumm was integrally involved in identifying and selecting the Maple 10 Investors and personally met with eight of the ten investors.

123.    Drumm approved the term sheets for the loans to the Maple 10 Investors to enable the private placement, including approval of a 25% limited recourse term, which meant that the loans were only recourse to the individual borrowers' assets for 25% of the outstanding loan amounts.

124.    Although share loans were typically granted on a full recourse basis, Drumm agreed to lend to the Maple 10 Investors on a limited recourse basis.

125.    On or about July 14, 2008, each of the Maple 10 Investors signed facility letters dated July 10, 2008 for loans each in the maximum amount of €60,000,000 to purchase AIBC shares through the private placement.

126.    Pursuant to the new loans, the Maple 10 Investors each in fact borrowed approximately €45,000,000 under their facilities to each purchase 10,200,000 AIBC shares at a price of €4.365 per share.

127.    The facility letters signed by the Maple 10 Investors provided security in the form of a charge over the AIBC shares purchased and personal recourse to the borrower "limited to 25% of the balance outstanding under the Facility."

128.    Within the first few months of the loans, some of the Maple 10 Investors sold portions of their holdings on the few days when AIBC's share price permitted a gain on the sale to reduce the amount of the loan outstanding, although such investors were reluctant to sell given the profit potential at higher price levels.

129.    By mid-October 2008, however, following the Irish government's blanket guarantee and continued market pressure, AIBC's share price had declined considerably to a price level now less than €3 per share, at which point some of the investors were quite concerned, although their losses were mitigated by the 25% limited recourse term.

130.    Nevertheless, it was concluded that the limited recourse term was not enough to protect the Maple 10 Investors, and a desire was expressed to further protect these investors to the detriment of AIBC by giving the investors some form of bargaining leverage to allow them to buy time in repaying whatever exposure they might incur under the loans.

131.    To effectuate the protections for the Maple 10 Investors from enforcement of AIBC's right to recourse, on or about October 13, 2008, Drumm and Whelan agreed to modify the recourse provision for the loans to the Maple 10 Investors.

132.    Their efforts to modify the recourse provision occurred within one month of the execution of the facility letters with non-recourse language provided to five executive directors at Drumm's direction and with his approval.

133.    Drumm agreed to and/or approved putting a letter in each Maple 10 Investor's file amending the original recourse provision for the sole purpose of creating ambiguity as to the recourse provision and impairing AIBC's enforcement of the loans.

134.    Acting in accordance with Drumm's agreement to modify the recourse provision, amended facility letters were prepared on or about October 13, 2008, which were backdated to July 17, 2008, and which were intended to supersede the original facility letters dated as of July 10, 2008.

135.    Whereas the original facility letter provided that "Recourse to the borrower will be limited to 25% of the balance outstanding," the modified facility letter added "or to the value of the shares at expiry of the facility" to the prior language in order to raise the potential that recourse, already limited, would be tied to the value of the shares, which could reasonably be expected at the time to reach even lower trading levels, even zero, as of the maturity date.

136. The modified facility letters would never have been approved if presented to credit committee for approval, and thus the letters were never brought forward by Drumm for credit committee approval.

137. On information and belief, six of the Maple 10 Investors signed and returned the modified facility letters, with the remaining four facility letters expiring by their own terms.

138. When he agreed to and/or approved the modified recourse letters, Drumm's sole intention was to look after high net worth customers rather than the best interests of the bank.

139. Drumm concealed the existence of the modified recourse letters from the board of directors.

140. Following the discovery of the existence of the modified recourse letters during a loan review in December 2008, on or about December 30, 2008, a draft report was prepared for AIBC's new chairman explaining the background of the transaction and describing Drumm's role in damaging AIBC through the modified recourse facility letters.

141. Drumm reviewed the draft report in late December of 2008.

142. Following Drumm's review, the draft report was not altered by Drumm with respect to its description of Drumm's role in approving the modified recourse letters and his express intent to protect customers through such letters.

## COUNT I

### NON-DISCHARGEABILITY OF DEBT; FALSE PRETENSES, FALSE REPRESENTATION OR ACTUAL FRAUD — 11 U.S.C. § 523(a)(2)(A)

143. Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

30

144.    Bankruptcy Code section 523(a)(2)(A) provides that a discharge under Bankruptcy Code section 727 does not discharge an individual debtor from "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).

145.    Drumm's share loan indebtedness to AIBC is nondischargeable pursuant to Bankruptcy Code section 523(a)(2)(A) because he induced AIBC to extend credit for his 2007 share loan facility, and the 2007 share loan facilities of the other executive directors, in justifiable reliance on Drumm's false pretenses, misrepresentations and/or actual fraud that such loans were accepted by the borrowers on a full recourse basis while Drumm secretly ensured that the loans were documented as non-recourse facilities.

146.    Drumm's additional indebtedness to AIBC secured by AIBC shares pursuant to the facility letter dated January 10, 2008 should be excepted from discharge because AIBC relied on Drumm's false pretense, misrepresentation, and/or actual fraud that he remained personally liable for such debt, although Drumm intended that such loans, together with his new share loan, be construed as non-recourse debt.

147.    Likewise, damages to AIBC arising from the debt of each of the executive directors owed to AIBC that had been wrongfully documented by facility letters dated January 10, 2008 as non-recourse loans should be awarded to AIBC and excepted from discharge because AIBC was induced to provide such facilities in reliance on Drumm's misrepresentations, and those of the other executive directors, that the loans would remain on recourse terms.

148.    After the non-recourse facility letters were discovered, Drumm induced AIBC to forebear and to extend the directors' loans for another year by misrepresenting that the non-recourse language in their 2008 facility letters had been due to a mistake.  In justifiable

31

reliance on Drumm's misrepresentations, and those of the other executive directors, AIBC

agreed to extend the maturity of and renew Drumm's loan, and each of the directors' loans, to

December 31, 2009.

149.    Any indebtedness to AIBC incurred by AIBC's former Chairman

FitzPatrick from the time Drumm knew about FitzPatrick's loan warehousing practice in 2005,

and thereafter concealed it, is nondischargeable debt.

150.    The McAteer Loan that was extended by AIBC based upon Drumm's false

pretense, misrepresentation, and/or actual fraud is nondischargeable debt.

151.    The debt excepted from discharge due to the Drumm's false pretenses,

false representations, and/or actual fraud includes: (i) the outstanding amounts due and owing to

AIBC on Drumm's loans, and the other executive directors' loans, (ii) the outstanding amounts

due and owing to AIBC relating to additional indebtedness incurred by AIBC's former Chairman

FitzPatrick from 2005 through 2008, (iii) the outstanding and unpaid amounts due and owing to

AIBC on the McAteer Loan, and (iv) any and all accrued and unpaid interest and any and all

attorneys' fees, costs, and expenses incurred by AIBC in dealing with, collecting, and remedying

these loan claims and responding to regulatory investigations, prosecutions, or other litigation

related thereto.

152.    Any and all amounts relating to the Maple 10 Investor share loans

approved by Drumm on a modified recourse basis are nondischargeable debts under Code

section 523(a)(2)(A), including, but not limited to, (i) the outstanding and unpaid amount due

and payable on any defaulted modified recourse Maple 10 Investor's share loan, and any all

attorneys' fees, costs, and expenses arising from such default, (ii) any and all attorneys' fees,

costs, and expenses however arising related to the modified recourse facility letters for the Maple

10 Investor share loans, and (iii) any and all attorneys' fees, costs, and expenses incurred by

AIBC in remedying the modified recourse Maple 10 Investor facility letters, collecting on its

loan claims against the Maple 10 Investors, and responding to regulatory investigations,

prosecutions, or other litigation related to the Maple 10 Investor loans.

       153.    Any deterioration in the value of Drumm's assets and the assets of the

other directors with directors' loans that were available to meet AIBC's loan demands in

December 2008, but became impaired or unavailable in December 2009 or later as a result of

AIBC delaying its demand for repayment, should be excepted from discharge.

       154.    AIBC requests the Court to determine and enter money judgment for

damages suffered by AIBC arising from each of the above-described instances of misconduct,

and declare that such judgments are non-dischargeable under Count I.

## COUNT II

### NON-DISCHARGEABILITY OF DEBT; FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY — 11 U.S.C. § 523(a)(4)

       155.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

       156.    Bankruptcy Code section 523(a)(4) excepts from discharge any debt "for

fraud or defalcation while acting in a fiduciary capacity . . . ."  11 U.S.C. § 523(a)(4).

       157.    Drumm was CEO and an executive director of AIBC from 2005 through

2008 and at all times during that period acted in a fiduciary capacity.

       158.    Drumm acted with fraudulent intent and/or an extreme departure from

standards of ordinary care when he failed to disclose to the board of directors the loan

warehousing transactions used to conceal the borrowings of AIBC's former Chairman

FitzPatrick, or to take any action to cease the loan warehousing practices, during his tenure as

CEO from 2005 through 2008, causing additional loans to be made by AIBC to Chairman

33

FitzPatrick that would not have been made if Drumm had disclosed the loan warehousing when he first became aware of the practice.

159.    Drumm approved, agreed to, and/or oversaw the false documentation of recourse loans to himself and other executive directors purportedly on a non-recourse basis, contrary to ordinary business practices and pursuant to a deeply flawed and corrupt process.

160.    Drumm approved and concealed the unusual and unwarranted McAteer Loan to refinance Bank of Ireland on preferential non-recourse terms and under circumstances of deteriorating collateral value and significant funding pressure without due care or diligence, exhibiting a high degree of recklessness and an extreme departure from ordinary lending standards.

161.    Drumm approved and agreed to the creation of the modified recourse facility letters dated July 17, 2008, but created on or about October 13, 2008, which were intended by Drumm to introduce uncertainty and impair the enforceability of the 25% recourse provision in the original facility letters for the Maple 10 Investors to benefit the investors in complete disregard for the duties he owed to AIBC.

162.    Drumm's breach of fiduciary duties with respect to the loan warehousing transactions, directors' loans, and the modified recourse letters for the Maple 10 Investors was done for his benefit, or for the benefit of other executive directors, insiders, or close associates, causing harm or defalcation to the Bank's financial interests.

163.    Drumm aided and abetted the breach of fiduciary duties by other directors for his benefit, or for the benefit of other executive directors, insiders, or close associates, causing harm or defalcation to the Bank's financial interests.

164.     Damages resulting from Drumm's fraud or defalcation while acting in a fiduciary capacity are as set forth in Count I and the debts should be excepted from discharge.

165.     AIBC requests the Court to determine and enter money judgments for damages suffered by AIBC in connection with the above-described misconduct, and declare that such judgments are non-dischargeable under Count II.

## COUNT III

### NON-DISCHARGEABILITY OF DEBT; WILLFUL OR MALICIOUS INJURY — 11 U.S.C. § 523(a)(6)

166.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

167.     Bankruptcy Code section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or the property of another entity."  11 U.S.C. § 523(a)(6).

168.     Drumm's willful and intentional non-disclosure of the loan warehousing transactions engaged in by AIBC's former Chairman FitzPatrick from 2005 through 2008 was done without just cause or excuse, and in conscious disregard of his duties as AIBC's CEO and executive director to disclose and stop the loan warehousing practices.

169.     Drumm's actions to cause or permit recourse loans to be documented with non-recourse language to certain of AIBC's executive directors in late 2007 and 2008, including loans made to himself, Quilligan, Whelan, Campbell, and McAteer, were the result of deliberate and intentional acts by Drumm intended to impair, injure, and/or nullify AIBC's right to recourse without just cause or excuse and in conscious disregard for his duties as CEO.

170.     Drumm's approval, instruction, and/or acquiescence to the creation of the modified recourse letters in 2008 to the Maple 10 Investors to intentionally obscure AIBC's clear right to partial recourse as to the investors was done with a conscious intent to injure AIBC for

35

the benefit of the investors and without just cause or excuse and in conscious disregard for his

duties as CEO.

171.    The injuries caused by Drumm's willful and malicious acts are the same as

the damages set forth in Count I and these debts should be excepted from discharge.

172.    AIBC requests the Court to determine and enter money judgment for

damages suffered by AIBC in connection with the above-described misconduct, and declare that

such judgments are non-dischargeable under Count III.

## RESERVATION OF RIGHTS

173.    During the course of this adversary proceeding, Plaintiff may learn

(through discovery or otherwise) of additional grounds to support the non-dischargeability of

Drumm's debts to AIBC or other related causes of action or matters.  Plaintiff is

contemporaneously filing a complaint pursuant to section 727 of the Bankruptcy Code to deny

discharge of all of Drumm's indebtedness and hereby reserves all rights as to that complaint and

adversary proceeding.  Plaintiff reserves its right to amend this original Complaint to include,

among other things: (i) further information on the facts alleged herein and the Counts asserted by

Plaintiff; (ii) additional grounds for nondischargeability under section 523 of the Bankruptcy

Code; and/or (iii) additional causes of action (collectively, the "Amendments"), that may become

known to the Plaintiff at any time during this adversary proceeding, through formal discovery or

otherwise, and for the Amendments to relate back to this original Complaint.

174.    This Complaint is without prejudice to the rights of Plaintiff to amend its

proofs of claim against Drumm or to assert new claims or causes of actions related thereto, or to

seek the authority to bring additional causes of action, for, among other things, fraudulent

transfers and/or conveyances, against any person, including, but not limited to insiders of Drumm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court enter judgment against the Defendant:

**A.**  excepting from discharge the Defendant's indebtedness to AIBC as set forth in Count I pursuant to 11 U.S.C. § 523(a)(2);

**B.**  excepting from discharge the Defendant's indebtedness to AIBC as set forth in Count II pursuant to 11 U.S.C. § 523(a)(4);

**C.**  excepting from discharge the Defendant's indebtedness to AIBC as set forth in Count III pursuant to 11 U.S.C. § 523(a)(6);

**D.**  determining the money damages suffered by AIBC pursuant to the allegations in this Complaint and entering judgment in favor of AIBC as to the money damages determined by the Court and excepted from discharge under Counts I, II, and III; and

**E.**  granting the Plaintiff such other and further relief this Court deems just and proper.

Respectfully submitted,

ANGLO IRISH BANK CORPORATION LIMITED,

By its attorneys,

/s/ Kenneth S. Leonetti
Kenneth S. Leonetti (BBO #629515)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
Tel.:  (617) 832-1000
Fax:  (617) 832-7000
Email: bctnotices@foleyhoag.com

and

Larry J. Nyhan, *pro hac vice*
John G. Hutchinson, *pro hac vice*
Candice L. Kline, *pro hac vice*
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel: (312) 853-7000

Of counsel:
Karyn Harty
MCCANN FITZGERALD
Riverside One
Sir John Rogerson's Quay
Dublin, Ireland
Tel: +353 1 829 0000
Email: karyn.harty@mccannfitzgerald.ie

Dated:  August 31, 2011